**FIRSTBANK PUERTO RICO, INC., Plaintiff**

v.

**INSTITUTO DE BANCA Y COMERCIO, INC., et al., Defendant(s).**

**Civil No. 09–2072 (JAG).**

United States District Court, D. Puerto Rico.

March 16, 2010.

---

Alberto Rodriguez–Ramos, Graciela J. Belaval–Bruno, Cristina S. Belaval–Burger, Martinez Odell & Calabria, San Juan, PR, for Plaintiff.

Harold D. Vicente–Gonzalez, Vicente & Cuebas, Richard M. Graffam–Rodriguez, Alejandro J. Cepeda–Diaz, McConnell Valdes, San Juan, PR, for Defendant.

## OPINION AND ORDER

GARCIA–GREGORY, District Judge.

Pending before the Court is Defendants Jeffrey T. Leeds ("Leeds"), Bradley Whitman, Leeds Equity Partners IV, LP (collectively "Leeds Defendants"), Guillermo Miguel NigaglioniVidal, Margarita Gorbea–Gonzalez, and the conjugal partnership composed by both of them, Justina Burgos, Rafael Jimenez–Molina, Yaran K. Correa–Padro, Jose L. Padial–Najeras, Elizabeth Morales, Doris Chambers, Jose A. Cordova–Medina, Felix D. Lugo–Sanchez, Nilsa S. Rios–Estrella, and the conjugal partnership composed by both of them (collectively "Individual Defendants"), Fidel Alonso–Valls ("FAV"), Barbara Vila, and the conjugal partnership composed by both of them, and Instituto de Banca y Comercio, Inc.'s ("IBC") (collectively "Defendants")[1] motions to dismiss. (Docket Nos. 23, 24, and 36).[2] For the reasons set forth below the Court **GRANTS** Defendants' motions to dismiss.

## FACTUAL AND PROCEDURAL BACKGROUND

On October 15, 2009, FirstBank Puerto Rico, Inc., ("FirstBank"), as holder of an alleged contractual right to become a shareholder of IBC, filed the present securities fraud action. FirstBank seeks to recover damages caused by alleged deceptive practices and a fraudulent scheme on the part of Defendants to divest FirstBank of its contractual right to purchase shares in IBC. FirstBank proffers claims under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j (b) and Commission Rule 10b–5, 17 C.F.R. § 240.10b–5.[3] Moreover, FirstBank submits supplemental claims under the laws of the Commonwealth of Puerto Rico. The following

---

1. The remaining Defendant, La Vida Merger Sub, Inc., has not moved for the dismissal of the claims proffered against it.

2. FAV, Barbara Vila, and the conjugal partnership composed by both of them joined the motions to dismiss filed by the other Defendants. (Docket Nos. 78 and 79).

3. Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful to "use or employ, in connection with the purchase or sale of any security …, any manipulative or deceptive device or contrivance…." 15 U.S.C. § 78j(b). Commission Rule 10b–5 outlaws, inter alia, making any "untrue statement of a material fact," or omitting to "state a material fact necessary in order to make the statements made … not misleading," or engaging in "any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b–5.

factual summary is derived from First-Bank's complaint. FirstBank's allegations are taken as true and all reasonable inferences are made in its favor. *Alternative Energy, Inc. v. St. Paul Fire & Marine Ins. Co.*, 267 F.3d 30, 36 (1st Cir.2001).

This cases arises out of a long standing contract dispute between FirstBank and IBC, an educational institution that provides student loans. Prior to 1999, First-Bank provided credit to IBC. In early 1999, while still in debt to FirstBank, IBC applied for further credit. FirstBank agreed to issue the loan subject to certain terms and conditions. Particularly, First-Bank required the execution of a warrant that provided it with the contractual right to acquire a 15% equity stake of IBC (hereinafter referred to as the "Warrant").[4] Pursuant to the terms and conditions of the Warrant, if 30% or more of the issued and outstanding common stock of IBC is purchased by any person or group of persons acting in concert, then the Warrant could be called by IBC and the right to exercise the Warrant would terminate. At the time the Warrant was executed, IBC had 21,919.73 shares of stock outstanding.

On March 11, 2004, FirstBank unsuccessfully attempted to exercise the Warrant by sending a letter to IBC, together with a certified check, requesting that IBC produce a stock certificate equivalent to a 15% equity stake in the company. IBC returned the check and indicated to First-Bank that in order to validly exercise its right, the original Warrant had to be delivered.

In a transaction signed on March 15, 2004, IBC issued 24,192.27 additional shares of common stock to FAV, at the time, IBC's principal shareholder, Presi-dent, and Chief Operating Officer. The stocks were issued at the price of $1.12 per share. Prior to the stock issuance, IBC amended its certificate of incorporation to reduce the par value of shares of common stock from one hundred dollars ($100) to one dollar ($1). This allowed FAV to acquire a significant amount of stocks directly from IBC at a reduced rate. At the time, the market value of IBC's shares was between $3,000 and $5,000 each. The new issuance of stock had the effect of increasing IBC's outstanding shares to 46,712. FirstBank was unable to participate in the new stock issuance although it had the contractual right to own a 15% equity interest in IBC. Pursuant to the Warrant, FirstBank had the right to maintain the same fractional interest irrespective of the issuance of additional shares.

On March 17, 2004, FirstBank perfected its exercise of the Warrant by sending a second letter attaching the original Warrant and requesting its participation over 15% of IBC's shares of common stock. On March 18, 2004, FAV sold 14,013.60 of the newly issued 24,192.27 shares to the Individual Defendants in order to meet the 30% threshold requirement to call the Warrant. On that date, IBC attempted to call the Warrant by sending FirstBank a check with an amount that was calculated utilizing an unfair exchange ratio per share. FirstBank never cashed the check.

On November 9, 2005, FirstBank brought an action in State Court against IBC and FAV to enforce the Warrant. In addition, FirstBank contested FAV's interested transaction and alleged longstanding fraudulent scheme to exclude FirstBank as a holder of a contractual right to become a shareholder for less than adequate

---

**4.** "A stock warrant is an instrument that grants the warrantholder an option to purchase shares of stock at a fixed price." *Lohnes* *v. Level 3 Communs., Inc.*, 272 F.3d 49, 53 (1st Cir.2001).

consideration. The State Court entered a partial judgment holding that FirstBank effectively exercised the Warrant on March 17, 2004. IBC appealed the decision. On August 24, 2007, the State Court of Appeals affirmed the partial judgment and recognized the atypical nature of the alleged 30% sale of stock to the Individual Defendants. Thereafter, IBC was ordered to issue the corresponding stock certificate, which is currently deposited with the State Court. FAV, Individual Defendants, and IBC, nonetheless, continued to profit from IBC's financial success at the expense of FirstBank by perceiving undeclared dividends in the form of "expenses" and "management fees." Specifically, IBC purchased yachts and planes for FAV's personal use and deprived the company of its earnings which are estimated to be in the excess of three million dollars ($3,000,000) per year.

While the lawsuit was on interlocutory appeal and without providing prior notice to FirstBank, the stockholders of IBC agreed to sell all outstanding shares of IBC's capital stock to Leeds Equity Partners IV, LP ("Leeds Equity") as part of a merger (hereinafter referred to as the "Merger"). On March 15, 2007, IBC, ANCBT Acquisition Corporation, National College of Business & Technology Company, Inc., as sellers, and La Vida Merger Sub, Inc. ("La Vida Merger") and Leeds Equity, as buyers entered into an Agreement and Plan of Merger (the "Merger Agreement") whereby the former sold the latter all of its outstanding shares of capital stock. According to FirstBank, La Vida Merger was a shell corporation created and capitalized by the Leeds Defendants to complete the Merger.[5] FirstBank submits that La Vida Merger was created and dissolved in only nine (9) days.

On the same date of the Merger, the Leeds Defendants entered into a Redemption and Assignment Agreement with FAV. Pursuant to the Redemption and Assignment Agreement, IBC would redeem certain shares of common stock in return for the assignment of certain receivables of IBC. Prior to the Merger, the Leeds Defendants liquidated these receivables to FAV for an additional consideration attributable to IBC of $13,421,938, which was excluded from IBC's acquisition purchase price.

FirstBank avers that at no time after the Merger was it given notice of the transaction or the information necessary to make an informed decision with regards to the valuation of its contractual right. Moreover, FirstBank contends that as a result of the intentional concealment on the part of Defendants, it was unable to file an injunction to prevent the occurrence of the Merger. FirstBank stresses that Defendants knew of its contractual right to become a stockholder, yet deliberately excluded FirstBank from the Merger. Furthermore, FirstBank submits that FAV and Individual Defendants concealed the Merger in order to profit at the expense of FirstBank. In addition, FirstBank alleges that Defendants continue to deny it access to material information with regards to the Merger.[6]

After FirstBank became aware of the execution of the Merger Agreement, it filed a motion in State Court to compel the production of the complete version of the executed document. FirstBank filed the

---

5. A shell corporation is a corporation that has no active business and exists only in name as a vehicle for another company's business operations. *Black's Law Dictionary* 368 (8th ed. 2004).

6. FirstBank initiated another legal action to nullify the Merger, which is currently before a State Court.

motion on October 5, 2007 and on October 17, 2007, IBC produced a complete version of the Merger Agreement. (Docket No. 1).

Defendants filed two motions to dismiss. Defendants proffer several grounds in support of the dismissal of the claims against them. Among them, that FirstBank's claims against Defendants under Section 10(b) and Rule 10b–5 are time barred. (Docket Nos. 23, 24, and 36). FirstBank opposed Defendants' dismissal requests. (Docket Nos. 37 and 38). On February 16, 2010, the Leeds Defendants replied to FirstBank's opposition. (Docket No. 58). On February 18, 2010, Individual Defendants replied to FirstBank's opposition. (Docket No. 59). FirstBank then submitted surreplies to Defendants' arguments. (Docket Nos. 74 and 75).

## STANDARD OF REVIEW

### 1. *Motion to Dismiss Standard.*

In *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), the Supreme Court held that to survive a motion to dismiss under Rule 12(b)(6), a complaint must allege "a plausible entitlement to relief." *Rodriguez–Ortiz v. Margo Caribe, Inc.,* 490 F.3d 92, 95–96 (1st Cir.2007) (quoting *Twombly,* 550 U.S. at 559, 127 S.Ct. 1955). The court accepts all well-pleaded factual allegations as true, and draws all reasonable inferences in plaintiff's favor. See *Correa–Martinez v. Arrillaga–Belendez,* 903 F.2d 49, 51 (1st Cir.1990). *Twombly* does not require heightened fact pleading of specifics; however, it does require enough facts to "nudge [plaintiffs'] claims across the line from conceivable to plausible." *Twombly,* 550 U.S. at 570, 127 S.Ct. 1955. Accordingly, in order to avoid dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient "to raise a right to relief above the speculative level." *Id.* at 555.

In *Ashcroft v. Iqbal,* —— U.S. ——, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), the Supreme Court upheld *Twombly* and clarified that two underlying principles must guide this Court's assessment of the adequacy of a plaintiff's pleadings when evaluating whether a complaint can survive a Rule 12(b)(6) motion. *See Iqbal,* 129 S.Ct. at 1949–50. The First Circuit has recently relied on these two principles as outlined by the Court. *See Maldonado v. Fontanes,* 568 F.3d 263, 266 (1st Cir.2009). "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949 (citing *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955).

"Second, only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 1950 (citing *Twombly,* 550 U.S. at 556, 127 S.Ct. 1955). Thus, any nonconclusory factual allegations in the complaint, accepted as true, must be sufficient to give the claim facial plausibility. *Id.* Determining the existence of plausibility is a "context-specific task" which "requires the court to draw on its judicial experience and common sense." *Id.* "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* (quoting Fed.R.Civ.P. 8(a)(2)). Furthermore, such inferences must be at least as plausible as any "obvious alternative explanation". *Id.* at 1950–51 (citing *Twombly,* 550 U.S. at 567, 127 S.Ct. 1955).

## DISCUSSION

### 1. *Statute of Limitations*

■ Under the Sarbanes–Oxley Act, a private claim under § 10(b) must be filed

by the earlier of (1) two years after the discovery of facts constituting the violation; or (2) five years after the violation. 28 U.S.C. § 1658. The two-year limitations period begins to accrue on the date when the plaintiff discovers or, in the exercise of reasonable diligence, should have unearthed the fraud. *Young v. Lepone*, 305 F.3d 1, 8 (1st Cir.2002). To determine when a reasonably diligent plaintiff should have unearthed the fraud complained of, courts must first determine whether the plaintiff was put on inquiry notice that fraud was afoot. *Id.* First, courts must determine whether, when, and to what extent there were sufficiently significant warnings to put a similarly situated investor on notice that fraud was in the wind. *Id.* Such signs are referred to as "storm warnings." *Id.*

"The next step requires the court to assay whether, once sufficient storm warnings were apparent, the investor probed the matter in a reasonably diligent manner." *Id.* The multifaceted questions of whether storm warnings were apparent and whether a particular plaintiff exercise reasonable diligence in the face of such warnings involves issues of fact that should be left for the fact finder to determine. *Id.* at 9. This sort of factual question may be determined as a matter of law only when the underlying facts are either admitted or undisputed. *Id.* (internal citation omitted).

The two year statute of limitations does not begin to accrue on the date that sufficient storm warnings first appear. *Id.* at 9–10. The limitations period begins to run on the date which an investor, alerted by storm warnings and thereafter exercising reasonable diligence, would have discovered the fraud. *Id.* The plaintiff cannot avoid the time bar by claiming that he did not know all of the details or "narrow aspects" of the alleged fraud. *In re Merck*

*& Co., Inc. Sec. Derivative & ERISA Litig.*, 543 F.3d 150, 166 (3d Cir.2008) (internal citation and quotation marks omitted). The period begins to run from the time at which the plaintiff should have discovered the *general* fraudulent scheme. *Id.*

Pursuant to the complaint, the Leeds Defendants' purportedly fraudulent conduct consists of capitalizing La Vida Merger and participating in the Merger without first redeeming FirstBank's Warrant or giving FirstBank notice of the Merger. Furthermore, FirstBank argues that the Leeds Defendants' fraudulent acts included the execution of the Redemption and Assignment Agreement with FAV to exclude $13,421,938 from IBC's purchase price. Likewise, FirstBank alleges that FAV, IBC, and Individual Defendants committed fraud in intentionally concealing the Merger. Plaintiff submits that FAV and Individual Defendants did not inform them of the Merger to profit from IBC revenues at the expense of FirstBank. Moreover, FirstBank avers that Individual Defendants' purchase of 30% of IBC's stock was part of the fraudulent scheme, which allowed Individual Defendants and FAV to profit from IBC at the expense of FirstBank.

FirstBank submits that Defendants were all cognizant of the fact that it had a contractual right to acquire a 15% equity stake of IBC. According to FirstBank, Defendants' actions effectively deprived it of the opportunity to appraise its contractual right to become a shareholder of IBC. Furthermore, FirstBank stresses Defendants' actions were done to purposely exclude FirstBank from its right to receive its share of IBC's purchase price. Additionally, FirstBank claims that Defendants did not give it prior notice to avoid the filing of an injunction that would have stopped the Merger.

In the complaint, FirstBank alleges that it became aware of the Merger Agreement before October 5, 2007. Moreover, FirstBank submits that on October 5, 2007, it filed a motion with the State Court to compel IBC to produce a complete version of the Merger Agreement. FirstBank states that IBC produced a complete version of the Merger Agreement on October 17, 2007.

According to Defendants, the two year limitations period began to run before October 5, 2007 because by that date, First-Bank was on inquiry notice of their alleged fraudulent conduct. Thus making First-Bank's claims time barred as its complaint was filed on October 15, 2009. FirstBank, on the other hand, argues that by October 5, 2007, there were no "storm warnings" that had put it on inquiry notice. Alternatively, FirstBank avers that the statute of limitations period began to accrue on October 17, 2007, as on that date, it received the Merger Agreement and discovered the alleged fraud perpetrated by Defendants.

First, we note that on November 9, 2005 FirstBank brought a suit before the State Court against FAV and IBC in which FirstBank specifically contested FAV's interested transaction and longstanding scheme to exclude FirstBank as a holder of a contractual right to become a shareholder for less than adequate consideration. Thus FirstBank was aware that there was a general fraudulent scheme on the part of FAV and IBC four years before filing the present suit. Moreover, in August 24, 2007, FirstBank was given a "storm warning" by the State Court of Appeals, which recognized the atypical nature of the 30% sale of stock to the Individual Defendants. Hence, by that date, FirstBank knew that IBC's outstanding shares had been increased and that Individual Defendants had purchased 30% of IBC's stock all without its participation. The State Court's holding should have put FirstBank on inquiry notice that fraud was aloof. Furthermore, FirstBank knew prior to October 5, 2007, that Defendants had executed the Merger Agreement and that it had not given FirstBank notice of said transaction. By that date, FirstBank was aware that Defendants purposely avoided FirstBank's participation in the Merger. Moreover, FirstBank knew that its Warrant had not been redeemed prior to the Merger.

In sum, the clock started when First-Bank learned of the Merger Agreement. At that moment, it was immediately apparent to FirstBank that Defendants deprived it of its opportunity to appraise its contractual right to become a shareholder of IBC, as the Merger was done without prior notice or the redemption of the Warrant.[7] Furthermore, at the time FirstBank got word of the Merger Agreement, it already had knowledge that FAV and IBC were engaged in an alleged fraudulent scheme to divest it of its contractual right to acquire 15% of IBC's stocks. Additionally, when FirstBank became aware of the Merger Agreement, it already knew that 30% of the shares of IBC were sold without its participation to Individual Defen-

---

7. In its surreply to the Leeds Defendants' reply arguments, FirstBank contends that the mere notice of the Merger did not put it on inquiry notice because after the Merger, Defendants could have advised it of its appraisal rights or attempted to purchase the Warrant. FirstBank's argument is unavailing. Most of the argument proffered by FirstBank to support its claim that Defendants engaged in a fraudulent scheme to divest it of its contractual rights are based on Defendants' alleged decision to purposely exclude FirstBank of the Merger. (Docket No. 1, ¶¶ 28, 57, 60, 74, 76, 84, 91, 93–95, 112, 114, 116, 128, and 133). Hence, we find that the two year statute of limitations period began to accrue when FirstBank knew that the Merger had occurred without its participation.

dants in a transaction, which had been described as atypical by the State Court of Appeals. We disagree with FirstBank's contention that the two year period did not accrue until it received a copy of the Merger Agreement. That document allowed FirstBank to better understand some of the details of the alleged fraud. The two year statute of limitations period did not begin to accrue when FirstBank found out of the details or narrow aspects of the alleged fraud perpetrated by Defendants. The statute of limitations began to accrue before October 5, 2007, as by that point FirstBank was aware of a general fraudulent scheme on the part of Defendants to divest it of its contractual right to acquire 15% of IBC's shares. Since FirstBank's complaint was filed on October 15, 2009, all of its claims against Defendants are time barred. Accordingly, all federal claims against Defendants must be dismissed.

### 2. *Supplemental Law Claims*

■ This Court should decline to exercise supplemental jurisdiction over a plaintiff's state law claims when all federal claims are dismissed. *See Camelio v. American Federation*, 137 F.3d 666, 672 (1st Cir.1998) (finding that "the balance of competing factors ordinarily will weigh strongly in favor of declining jurisdiction over state law claims where the foundational federal claims have been dismissed at an early stage in the litigation") (internal citations omitted). FirstBank's federal claims against Defendants shall be dismissed. As a result, this Court will not exercise supplemental jurisdiction over FirstBank's state law claims against Defendants.

### CONCLUSION

For the reasons set forth above, the Court **GRANTS** Defendants' motions to dismiss. (Docket Nos. 23, 24, and 36). All claims against moving Defendants shall be dismissed. Partial Judgment shall be entered accordingly.

IT IS SO ORDERED.